UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK
--------------------------------------------------X
ANDREA SCHMIDT,                                        MEMORANDUM

                          Plaintiff,                   AND ORDER


                                                       02CV6083(SLT)(ETB)

            -against-



STATE UNIVERSITY OF NEW
YORK AT STONYBROOK and
FREDERICK MILLER, M.D.,

                          Defendants.
--------------------------------------------------X
TOWNES, U.S.D.J.

        Plaintiff Andrea Schmidt ("Plaintiff" or "Schmidt") brings this action pursuant to Title

VII of the Civil Rights Act of 1964 ("Title VII") and New York State Human Rights Law

("NYSHRL") for the discrimination she alleges she suffered at the hands of Dr. Frederick Miller

("Miller" or "Defendant Miller") while the two were employed by defendant State University of

New York at Stonybrook ("SUNY" or the "University").  Both Miller and SUNY move for

summary judgment dismissing the complaint.  Based upon all submissions of the parties, and for

the reasons stated below, both Defendants' motions are hereby GRANTED.


I.      *Facts and Procedural History*

        Schmidt began working as a temporary employee in Defendant SUNY's Pathology

Department in the summer of 1998. (Def. SUNY 56.1 Stat. ¶ 1.)  At the time Plaintiff was hired,

she was supervised by Barbara Kelly ("Kelly") and performed administrative work in the

Pathology Department.  (Def. Miller 56.1 Stat. ¶ 2.)   In July 1999, Kelly offered Plaintiff a full-

time job in the department as an administrative assistant.  (Def. SUNY 56.1 Stat. ¶ 5; Def. Miller 56.1 Stat. ¶ 3.)  At the time Plaintiff began working at SUNY, Defendant Miller was the Chair of the Pathology Department.  (Def. Miller 56.1 Stat. ¶ 4.)  Miller resigned from this position at the end of 2000, but still held various posts at the University, including, *inter alia*, Pathologist-in-Chief, Director of Laboratories, Associate Director of Laboratories, and he held an endowed chair as a Professor of Pathology.  (Kritzer Aff.  Ex. 1C at 937-8, 941; Def. SUNY 56.1 Stat. ¶ 7.)  Miller was a high-ranking, tenured founding member of the faculty who, according to Plaintiff, spoke freely of the power he held.

Plaintiff suffered from anorexia nervosa and, sometime after commencing employment with SUNY (but in either 1998 or 1999), she suffered a relapse of the disorder and was out of work for one month, a period referred to in the pleadings as Plaintiff's "house hospitalization." (Def. Miller 56.1 Stat. ¶¶ 5-6.)  Plaintiff's co-workers were aware of Plaintiff's anorexia when she returned from her house hospitalization.  (*Id.* at ¶ 6.)  Miller in particular asked Plaintiff about her disorder.  (*Id.* at ¶ 7.)  Plaintiff testified that Miller "showed concern and...wanted to know more about the illness."  (Schlossberg Aff. Ex. C at 97.)   Miller inquired as to how and why Plaintiff fell prey to anorexia, whether she was seeking help, and what she was eating.  (*Id.*)  On several occasions, Miller placed cookies and/or vitamins on Plaintiff's desk beside post-it notes reading "eat me."  (*Id.*)  However, he stopped doing this after Plaintiff told him it was not working.  (Def. Miller 56.1 Stat. ¶ 16.)

Plaintiff initially believed Miller was concerned about her health.  (*Id.* at 113.)  She told Miller that she was hospitalized in the past because of her anorexia and almost died.  (Def. Miller 56.1 Stat. ¶ 12.)  She also gave Miller a copy of a book entitled "The Secret Language of

Eating Disorders" to help him understand her illness. (*Id.* at 114.) Per Miller's request, Plaintiff also provided him with copies of poems she wrote and artwork she created. (Schlossberg Aff. Ex C at 114-118.)

*Special Project*

Plaintiff testified that, at the end of 2000, after Miller stepped down from the position of Chair of the Pathology Department, he started dedicating more time to her. (Schlossberg Aff. Ex. C at 127.) In May of 2001, Plaintiff began assisting Miller on a special project. (Def. Miller 56.1 Stat. ¶ 25.) According to the "Request for Approval of Extra Service for Research Foundation Employees" (the "Form"), Schlossberg Aff. Ex. G, the project involved scanning slides and incorporating them into JPEG images to be put on a CD and used for teaching purposes. (Def. Miller 56.1 Stat. ¶ 26.) Plaintiff indicated on the Form that her compensation would be $15,000 "+ fringes," in addition to her regular salary. (*Id.*) Both Plaintiff and Miller signed the Form, and Kelly appears to have played a role in obtaining approval for the project. (Schlossberg Aff. Ex. G; *see also* Ex U (Kelly e-mail outlining proposed salary changes).)

Plaintiff testified that a condition to accepting the additional work was that a portion of it would have to be performed at Miller's home. (Kritzer Aff. Ex. 2 at 136; Schlossberg Aff. Ex. C at 134.) Plaintiff told Miller that she would only be comfortable going to his home "if it was on a professional basis," to which he responded that his wife would be present at all times. (Kritzer Aff. Ex. 2 at 136-137.) Plaintiff agreed to work at Miller's home, though she testified that she did not believe she had a choice if she wanted the additional work. (*Id.*) Plaintiff went to

Miller's home between five and ten times in furtherance of this project, and was given a laptop computer to facilitate the assignment. (Schlossberg Aff. Ex. C at 134-139.)

In the course of performing the project at Miller's house, Plaintiff alleges she became overwhelmed by the amount of attention Miller gave her and that which he demanded in return. For example, in the summer of 2001, Miller invited Plaintiff to the ballet and she declined. (Kritzer Aff. Ex. 2 at 151.) Thereafter, Miller invited Plaintiff to accompany him and his wife to the Bronx Zoo. (*Id.*) Plaintiff claims Miller knew that she liked animals and that she would therefore have no excuse to turn down an invitation to the zoo. (*Id.*) Plaintiff testified that she hesitated but ultimately went with the couple, after being instructed by Miller to keep the excursion a secret from her co-workers. (Schlossberg Aff. Ex. C at 480.)

Plaintiff testified in her deposition that she was reluctant to ever turn Miller down "because when [she] seemed unappreciative, [Miller would initiate] long discussions." (Kritzer Aff. Ex. 2 at 361.) For example, when asked in her deposition why she did not decline the invitation to the Bronx Zoo, Plaintiff answered:

> I knew it would hurt his feelings and I knew he would ask me why I felt uncomfortable and I knew that we were going to have a long in-depth conversation about how he felt towards me. I didn't want to get into another one. We had spoken about this too many times....Because when he was upset about something I said, my work would be involved. He would bring up how can I work with somebody if we don't have this understanding, if we don't have a mutual understanding of our relationship? How can I work with someone if they are uncomfortable with me?

> [...]

> [W]hen I used to say [no to] him, he would take me into his office and ask me why I was uncomfortable going to his house, why I was uncomfortable talking

> about things, why I didn't feel comfortable talking about my modeling,[1] why I didn't feel comfortable talking about my dates. There came a point where he would inquire about my sexual activity and even e-mailed me about it. So it was something I did not want to get into with him anymore.

(Kritzer Aff. Ex. 2 at 153-5; *see also* Schlossberg Reply Aff. Ex. C (Arbitration Award) at 2 (finding Miller "devoted inordinate blocks of time to discussing with [Plaintiff] the status of the relationship").)

Plaintiff testified that, during the months in which she worked on the special project with Miller, he overheard her having a phone conversation with a man she recently started seeing romantically. (Kritzer Aff. Ex. 2 at 163.) Miller called Plaintiff into his office and asked with whom she had been speaking. (*Id.* at 164.) Plaintiff responded that it was a friend or acquaintance. Miller became upset and responded, "It doesn't sound like a friend to me." (*Id.* at 164-5.) Miller is also alleged to have said "I don't see how you can deprive me of the joy of knowing that you're seeing someone knowing that it would make me happy that I knew that you were seeing someone." (*Id.* at 165.) That weekend, Miller called Plaintiff at home and allegedly said "Do you think I'm stupid?...[W]hy haven't you told me that you were seeing someone?" (*Id.*)

*E-mail Exchanges*

The record contains copious e-mails exchanged between Plaintiff and Miller, many extensively discussing the parties' feelings for one another, and reflect a progression in the

---

[1] Plaintiff modeled prior to working at SUNY.

relationship that on its face appeared consensual until a certain point. (*See generally* Schlossberg Aff. Ex. H, I, J, N, O, Q.)

For example, on June 18, 2001, Plaintiff wrote an e-mail to Miller declining his offer to have a "kind of relationship similar to that of an adoptive daughter." (Schlossberg Aff. Ex. I.) Plaintiff also states in an e-mail to Miller: "I like being friends with you, but as I stated, you may want a closer relationship and I will not be angry or upset if you choose to be on a professional level with me only. I was not expecting you to become so close." (*Id.*) On July 21, 31, and at least one other occasion prior to August 11, 2001, Miller wrote to Plaintiff offering her to support her (both financially and emotionally) and either demanded affection in return, *see* Schlossberg Aff. Ex. Q, or asked Plaintiff what he could expect in return. (*See* Schlossberg Aff. Ex. N; Pack Decl. Ex. E at 8 ¶ 44 ("In this world nothing is free.").) Plaintiff responded that she would continue to work on the special project, as initially agreed, and repeatedly declined his invitations to be "like an adoptive daughter" to him and his wife. (*Id.* at Exs. J, N, O.)

Additionally, Plaintiff testified that Miller called her "Sugarplum;" said "That's some slit" regarding one of her skirts; told her (in his home) that he really cared about her while rubbing her knee; put a plant on her desk and told her, "They call it a penis plant. It's looking a little limp;" said that if he were Plaintiff's age he would take her out; offered to pay for the breast implants Plaintiff admitted she wanted; wrote a poem called "On legs" about Plaintiff's legs (including the lines, "If I had yours, they'd be out there. No boots, no gear."); created a "brochure" (including, *inter alia*, the line, "I can be a lot of fun...Try me and you'll see") and placed it on Plaintiff's desk in an attempt to advertise her availability to suitors; showed her a picture of a celebrity wearing a sheer dress showing her nipples and asked Plaintiff if she would

like to wear that dress; said he would like to buy her a black slinky dress; and said that a particular shirt accentuated her bosoms; set a photograph of Plaintiff as the desktop wallpaper on his computer; and used a photograph of Plaintiff in a Power Point presentation in the office without her permission.  (Schlossberg Aff. Ex. C at 171, 178, 186, 188, 189, 197, 199, 203, 204; Ex. S (collection of poems); Ex. T; Am. Complaint ¶ 14; Kritzer Aff. Ex. 2 at 30; *see generally* Schlossberg  Aff. Ex. L (e-mail from Miller to Plaintiff offering a "close friendship," "unconditional support," asking Plaintiff to take on role as adoptive daughter to Miller and his wife) *and id.* at 4 (referring to Plaintiff as "Sugarplum").)[2]

   Plaintiff also alleges that Miller wrote a poem to her containing the following:

> This is here and now, something you can touch, a soft and friendly touch, a hand when things are tough...I love you so and that you know, the thing you never see. Oh, woman, feel thyself and join me in my quest to liberate the cherished things inside.  Seek a way that opens up the jewels that make you what you are.  Too

---

[2] Plaintiff has been unable to allege specific dates for many of the alleged incidents of harassment.

   "In states such as New York, which has a local agency with the authority to address charges of employment discrimination, the statute of limitations for filing a charge of discrimination with the EEOC is 300 days."  *Johnson v. The Trustees of Columbia University*, 2003 WL 2013371 (S.D.N.Y. 2003).   However, "[h]ostile work environment claims are different in kind from discrete acts.  Their very nature involves repeated conduct....The 'unlawful employment practice' therefore cannot be said to occur on any particular day.  It occurs over a series of days or perhaps years and, in direct contrast to discrete acts, a single act of harassment may not be actionable on its own."  *National R.R. Passenger Corp. v. Morgan*, 536 U.S. 101, 115 (2002) ("*Morgan*"); *see also Domb v. Metropolitan Life Ins. Co.*, 2003 WL 21878784, *8 (S.D.N.Y. 2003) ("the fact that [plaintiff's] subjective experience in 1997 had not yet sunk to the level of a hostile environment does not mean that the pattern of conduct did not contribute to the creation of such an environment later").  "[I]n the case of a hostile work environment claim, the statute of limitations requires only that one sexually harassing act demonstrating the challenged work environment occur within 300 days of filing; once that is shown, a court and jury may consider the entire time period of the hostile environment."  *Petrosino v. Bell Atlantic*, 385 F.3d 210 (2d Cir. 2004) (*quoting Morgan*).  It is undisputed that at least one of the alleged events occurred within the statutorily prescribed period.   Therefore, Plaintiff's failure to properly allege specific dates does not prevent this Court's consideration of them.

much pleasure lies at risk to think about a loss.  I want your wealth within to have a chance to breathe.  Where ere you are or ere will be my heart goes out to you.

(Schlossberg Aff. Ex. C at 336-7.)

By July 2001, Plaintiff found the situation with Miller to be "intolerable."  (Schlossberg Ex. C at 177.)  Plaintiff testified that "[H]e kept telling me that he would try and act appropriately.  He kept telling me that he would stop and back off....I even said to him 'Dr. Miller, you're obsessed.'  He said, 'I know.  I'm trying to get better.'" (*Id.*)

On July 31, 2001, Plaintiff wrote to Miller, *inter alia*: "I am sorry that I can't be more of what you want me to be or show the amount of affection that your children do.  I sincerely feel strongly towards you and your wife, and cannot thank you enough for everything you've given me (not just monetarily either)."  (Schlossberg Aff. Ex. J.)  In response, Miller wrote:

> This is not easy for me.  Sometimes you pretend everything is fine but it isn't– far from it.  My feelings don't change but I am able to modify and control them....I can't be as warm...you saw a very special part of me.  I can't extend myself for you, I can't be your advocate or protector, possibly you will change but I really doubt it– if you do I don't plan to go anywhere.  You need only remember that I will have a spot for you indefinitely but you just can't land in it when you want.

(*Id.*)

On August 6, 2001, Miller presented Plaintiff with a document she refers to as a "Balance Sheet."  In it, Miller outlines for Plaintiff's consideration the pros and cons of a "Professional" relationship with him versus a "Caring" relationship.  (*See* Schlossberg Decl. Ex. M.)  If Plaintiff selected the "Professional" relationship, Miller promised there would be little stress but that the relationship would be superficial and Miller would have "no incentive...to provide anything that would help [her] outside of the narrow confines of the project."  The "Caring," relationship involved, *inter alia*, "as close to total security" as Miller could provide, "from cell phone to

vacation," and required of Plaintiff "willingness to change," "expression of affection: from touch to words," "inquiring about what [Miller and his wife] do," "random (unscheduled) call[s] inquiring as to how [Miller and his wife] are," "taking an extra few minutes when you visit (for work) just to chat about anything," and "poems, pictures, drawings." *Id.* Miller even assigned additional weight to some of the tasks he wished Plaintiff would perform. (*See*, *e.g.*, *id.* at 2 ("Expression of feeling: sometimes I will just tell you I feel warmed by your presence or it is nice to have you in the room....three stars.").)

Plaintiff elected for a "Professional" relationship, at which point Miller discontinued teaching her video editing and her performance of the special project, notwithstanding his assurance (as memorialized by the Balance Sheet) that the "Professional" relationship allowed her to continue. (Schlossberg Dec. Ex. C at 179; Pack Decl. Ex. D at 2 (Plaintiff's internal complaint against Miller indicating loss of income from work related to his project).)

*Plaintiff Complains of Sexual Harassment to SUNY*

SUNY maintains a policy against Sexual Harassment that, *inter alia*, defines sexual harassment and informs employees of the procedures for filing a complaint. (Pack Aff. Ex. F.) The policy instructs employees to report incidents of discrimination within 45 days of the employees' knowledge thereof. Though Plaintiff does not have a specific memory of receiving the policy, she does not dispute that, like all SUNY employees, she received same upon the commencement of her employment there. (Pl. 56.1 Stat. ¶ 91.)

On August 6, 2001, the same day she received the Balance Sheet from Miller, Plaintiff notified Kelly that she felt she was being sexually harassed by him. (Pack Decl. Ex G1 at 486-

7.)  Plaintiff also provided Kelly with a copy of some of the e-mails exchanged between her and Miller.  On August 14, 2001, after meeting with representatives from Human Resources, Plaintiff filed a formal complaint against Miller with the Office of Diversity, was told by them to stay home until Miller's office could be relocated, offered the opportunity to move to another location within the University, and offered her own parking spot far away from Miller's.  (Pack Decl. Ex. G1 at 219-224.)  SUNY moved Miller's office to another floor in a different section of the building, instructed him not to contact Plaintiff, and began an investigation of Plaintiff's complaint no later than August 27, 2001.  (Schlossberg Reply Aff. Ex. A. at 221.)

Nevertheless, Plaintiff testified that, during her leave, Miller continued to contact her on a daily basis, "asking me where I was, leaving me messages on my phone, e-mailing me, telling me that I know you are out and about because I know you have been to the gym," (Kritzer Aff. Ex. 2 at 225.)  On August 20 and 21, 2001, Miller e-mailed Plaintiff informing her that Kelly was no longer her supervisor, that Plaintiff had missed "several appointments" with Miller, and that Miller was now officially her supervisor.[3]  (Kritzer Ex. 5.)  Both SUNY and Miller deny that Miller was ever Plaintiff's supervisor.

By September 5, 2001, Miller's office had been relocated.  (Pack Decl. Ex. G3 at 41.) However, on Plaintiff's first day back to work, Miller called her in her office to let her know that "[w]hatever has transpired....there's no hard feelings."   (Pack Decl. Ex. G1 at 222.)  Plaintiff contacted Elizabeth McCoy ("McCoy") SUNY's Director of Labor Relations, met with a member of the University Police and was given the option of pressing charges against Miller,

_____

[3]  The date on which SUNY instructed Miller not to contact Plaintiff is not made clear in the record.  Therefore, this Court cannot make a finding as to the appropriateness of these attempts by Miller to contact Plaintiff.

which she declined.  (*Id.* at 223-4.)  Miller also left a bouquet of flowers on Plaintiff's desk with a note saying "[s]ooner or later we will meet – I won't bite – no need to hide," causing Plaintiff to "flip out."  (Kritzer Aff. Ex. 2 at 225; Pack Decl. Ex. E at 10 ¶ 51.)  Plaintiff also alleges that Miller called her office and asked her, "Do you think the IRS would be interested in your situation?"  (Pack Decl. Ex. E at 10 ¶ 53.)

SUNY"s investigation culminated in its issuance of a Notice of Discipline against Miller seeking his termination.  (*See generally* Pack Decl. Ex. E.)  Miller exercised his right, under a collective bargaining agreement, to file an appeal, and an arbitration ensued.  The arbitrator ruled that Miller's conduct warrants a "substantial penalty" but that "[t]ermination is an unduly harsh punishment...given the unique features of the case, the grievant's long service and many accomplishments, and the improbability of the conduct recurring."   Schlossberg Reply Aff. Ex. C ("Arbitration Award") at 31.  Miller was punished instead with a 90-day suspension without pay and mandatory counseling.  *Id.*  As far as this Court is aware, both he and Plaintiff remain employed by SUNY, and Plaintiff still sees Miller occasionally.  (Kritzer Aff. Ex. 2 at 232.)

Plaintiff filed the instant complaint alleging that she suffered discrimination in the form hostile work environment.  She brings a claim under Title VII against SUNY and one under NYSHRL against Defendant Miller.  Both Defendants move for summary judgment.

II.    *Discussion*

Summary judgment is appropriate where "there is no genuine issue as to any material fact." Fed. R. Civ. P. 56(c). "A fact is 'material' for these purposes if it 'might affect the outcome of the suit under the governing law." *Holtz v. Rockefeller & Co.*, 258 F.3d 62, 69 (2d Cir. 2001) (*quoting Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242 (1986)). To be "genuine," an issue of fact must be supported by evidence "such that a reasonable jury could return a verdict for the nonmoving party." *Holtz*, 258 F.3d at 62. Because the moving party bears the burden of showing that there are no genuine issues of material fact, *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986), "a court must resolve all ambiguities and draw all reasonable inferences against [it]." *Alston v. New York City Transit Authority*, 2003 U.S. Dist. LEXIS 21741, *4 (S.D.N.Y. 2003) (*quoting Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574 (1986)).

A.    *Title VII Claim Against SUNY*

Title VII established that "[i]t shall be an unlawful employment practice for an employer to...discriminate against any individual with respect to his compensation, terms, conditions, or privileges of employment, because of such individual's race, color, religion, sex or national origin." 42 U.S.C.A. § 2000e-2(a)(1). The Code of Federal Regulations ("CFR") promulgated three types of conduct that constitute sexual harassment:

> Unwelcome sexual advances, requests for sexual favors, and other verbal or physical conduct of a sexual nature constitute sexual harassment when (1) submission to such conduct is made either explicitly or implicitly a term or condition of an individual's employment, (2) submission to or rejection of such conduct by an individual is used as the basis for employment decisions affecting such individual, or (3) such conduct has the purpose or effect of unreasonably interfering with an individual's work performance or creating an intimidating, hostile or offensive work environment.

29 C.F.R. 1604.11.  Plaintiff here argues only that subsection (3) applies.

In order to establish a prima facie case of sexual harassment based on a hostile work environment, a plaintiff must demonstrate: "(1) that she is a member of a protected group; (2) that she was the subject of unwelcome advances; (3) that the harassment was based upon her sex; and (4) that the harassment affected a term, condition or privilege of employment."  *Cosgrove v. Sears, Roebuck & Co.*, 9 F.3d 1033, 1042 (2d Cir. 1993).  Only the first factor is undisputed in this case.

*Requirement That Conduct Be Unwelcome*

Defendant Miller argues that Plaintiff's "lengthy, emotional charged e-mails in which she expressed her gratitude for [Miller's] care and concern" preclude a finding that his advances were unwelcome.  (Def. Miller Reply Mem. of Law at 8.)  However, this Court finds that there exists questions of fact surrounding whether Plaintiff considered the advances unwelcome. "The question whether particular conduct was indeed unwelcome presents difficult problems of proof and turns largely on credibility determinations committed to the trier of fact."  *Meritor Savings Bank, F.S.B. v. Vinson*, 477 U.S. 57, 68 (1986).  "The correct inquiry is whether [Plaintiff] *by her conduct* indicated that the alleged sexual advances were unwelcome, not whether her actual participation...was voluntary."  *Id.* (emphasis added); *Eisenhauer v. Great Lakes Plastics*, 2001 WL 209904, at *5 (W.D.N.Y. Feb. 23, 2001) ("If the victim does not subjectively perceive the environment to be abusive, the conduct has not actually altered the conditions of the victim's employment, and there is no Title VII violation.").

Though "[t]he EEOC Guidelines are not controlling authority, they provide substantial assistance in this area of agency expertise." *Gallagher v. Delaney*, 139 F.3d 338, 346 (2d Cir. 1998). With regard to unwelcome conduct, the CFR instructs to "look at the record as a whole and at the totality of the circumstances, such as the nature of the sexual advances and the context in which the alleged incidents occurred. The determination of the legality of a particular action will be made from the facts, on a case-by-case basis." 29 C.F.R. § 1604.11(b).

In this case, though Defendant argues that Plaintiff was a willing participant at all times, the record contains evidence that she may not have been. There is certainly evidence that Plaintiff did not openly object to many of Miller's advances, and that, quite paradoxically, she may have encouraged him to continue the relationship by, *inter alia*, thanking him for his concern and neglecting to tell him outright that she did not appreciate the attention. However, there is also evidence that Plaintiff was unwell emotionally, afraid to challenge Miller's authority in the department, and did "everything in [her] power not to get Miller upset" for fear of "the repercussions involved," *i.e.*, being forced to have long conversations with him at work. (Kritzer Aff. Ex. 2 at 156, 353, 361, 418, 424.) It is difficult to determine whether during the relevant time period Plaintiff felt and, more importantly, indicated by her letters and e-mails, that she considered the attention from Miller to be unwelcome. (*Compare* Schlossberg Aff. Ex. E ("On a personal note, I want to thank you for all the support and concern you've shown me. "); *id.* (signing letter "With Luv"); Ex. H ("I am truly grateful for your concern and care and I regard you as an important person in my life and thank you for everything you have done."); *and* Schlossberg Ex. I ("I am comfortable with the way things are.") *with* Kritzer Aff. Ex. C at 424 ("When I told him [Miller] I was uncomfortable with the way things are, he didn't like it. So I

had to tell him I was comfortable."); Schlossberg Aff. Ex. O ("When you offered me the job...you never specified that there was to be an emotional investment....I told you that I did not feel the same way....How should I feel when everything offered to me is being questioned because I do not give you enough emotion/affection or what you feel I should be giving you on a personal basis?"); Pack Decl. Ex. G1 at 490 ("I told [Kelly] I was uncomfortable and that I couldn't get my work done because he was overbearing."); Schlossberg Aff. Ex. C at 177 ("I even said to him 'Dr. Miller, you're obsessed.' He said, 'I know. I'm trying to get better.'"); Ex. I ("I am not ready to have the kind of relationship" Miller requested); *and* Arbitration Award at 29-30 (Plaintiff felt that she was walking on eggshells because Miller "had tenure, he was once the Chairman of the department" and told Plaintiff "he has control over everything that happens in the department.").)

This Court finds that "[Plaintiff's] evidence could support her contention that [defendant] said and did things of an erotic nature to which she objected, presenting a factual issue as to whether his conduct was sexually inappropriate and unwelcome." *Gallagher*, 139 F.3d at 346. "That [plaintiff] accepted...offerings...on occasion does not necessarily demonstrate her amenability to an intimate relationship." *Id.*; *cf. Eisenhauer*, 2001 WL 209904, at *5 (question of fact remained as to whether defendant's conduct was unwelcome where defendant alleged plaintiff freely discussed personal sexual experiences).


*Was Miller's Harassment Based on Plaintiff's Sex?*

Defendant Miller also argues that his conduct was not "sexual," and thus, cannot properly be the subject of a sexual harassment claim. Miller makes this assertion based on Plaintiff's

testimony that the relationship with Miller was not sexual, that he never asked to have sex with her, and that his love for her was like that of a father to an adoptive daughter.  (Def. Miller Reply at 8.)

"It is axiomatic that in order to establish a sex-based hostile work environment claim under Title VII, a plaintiff must demonstrate that the conduct occurred because of her sex." *Alfano v. Costello*, 294 F.3d 365, 374 (2d Cir. 2002).  To be on account of sex, the actions and comments complained of needn't be explicitly sexual.  *See generally id.* at 374-381.  "Facially neutral incidents may be included...among the 'totality of the circumstances' that courts consider in any hostile work environment claim, so long as the reasonable fact-finder could conclude that they were, in fact, based on sex."  *Id.* at 378.  "But this requires some circumstantial or other basis for inferring that incidents sex-neutral on their face were in fact discriminatory."  *See id.* In other words, if other evidence in the record could indicate to a reasonable jury that an apparently sex-neutral incident is in fact sex-based, the sex-neutral incident cannot, at this stage, be ruled out as a component of the overall alleged harassment.  Conversely, if there appears no reason to leave open the possibility that a sex-neutral incident may have been intended to carry sexual undertones, that incident cannot be considered on a motion for summary judgment.  *See id.* (declining to consider relevant the sex-neutral incidents involving individual who played no role in sex-related incidents); *see also Gallagher*, 139 F.3d at 346 (reversing summary judgment of hostile work environment claim where supervisor, *inter alia*, gave plaintiff gifts, complimented her appearance, gave her days off without charging her personal time, authorized her use of the company car, asked her personal questions and, after inviting her to Atlantic City,

made known that he "had control over her career," though he never directly asked for sexual favors).

Here, the Court finds sufficient evidence of sex-based incidents and behavior on the part of Miller that could lead a reasonable jury to find, after viewing the evidence in totality, that some or all of the sex-neutral incidents are in fact sex-based. Defendant's Miller's sex-based actions include, *inter alia*, saying to Plaintiff "that's some slit" in Plaintiff's skirt; both his comment that a particular plant is called a "penis plant" and that the plant was "a little limp;" putting the "brochure" advertising Plaintiff's availability on her desk; telling Plaintiff if he were her age he would take her out; offering to pay for the breast implants Plaintiff admitted she wanted; asking Plaintiff if she would like to wear a dress revealing her nipples while showing her a picture of a celebrity wearing same; saying he would like to buy Plaintiff a black slinky dress, patting Plaintiff on her knee, and pointing out that a shirt accentuated Plaintiff's bosoms. In particular, the Court finds that the poems written by Defendant Miller were highly sexual in nature. (*See* Schlossberg Aff. Ex. S.) Among the many facially sex-neutral comments that a reasonable jury may ultimately find to be sex-based are Miller's habit of referring to Plaintiff as "Sugarplum;" using her photograph as desktop wallpaper on his computer and during a Power Point presentation given in the office without her permission; becoming upset upon learning that Plaintiff was involved in a relationship with another man; calling and e-mailing her to inquire as to whether she was sexually active; and requiring that her overtime work be done from his home. Therefore, contrary to Defendant Miller's allegations, the absence of sexual activity between Plaintiff and Miller does not render her claim of sexual harassment meritless. *Gallagher*, 139

F.3d at 347 ("[E]valuation of ambiguous acts such as those revealed by the potential evidence in this case presents an issue for the jury.")

*Pervasiveness of Harassment*

One claiming a hostile work environment based on sexual harassment in the workplace must show that the environment "would reasonably be perceived, and is perceived as hostile or abusive." *Harris v. Forklift Sys., Inc.*, 510 U.S. 17, 22 (1993). "[W]hether an environment is 'hostile' or 'abusive' can be determined only by looking at all the circumstances. These may include the frequency of the discriminatory conduct; its severity; whether it is physically threatening or humiliating, or a mere offensive utterance; and whether it unreasonably interferes with an employee's work performance." *Id.* at 23. Furthermore, "[f]or sexual harassment to be actionable, it must be sufficiently severe or pervasive 'to alter the conditions of [the victim's] employment and create an abusive working environment.'" *Meritor*, 477 U.S. at 67. This determination involves both an objective and subjective inquiry. *Raniola v. Bratton*, 243 F.3d 610, 620 (2d Cir. 2001).

Though "there is neither a threshold magic number of harassing incidents that gives rise...to liability as a matter of law, nor a number of incidents below which a plaintiff fails as a matter of law," this Court finds that, objectively, Plaintiff has painted a picture of Miller's sufficiently severe intrusion on her work environment, as well as on her personal life, to withstand summary judgment. *Holtz*, 258 F.3d at 75-76 (objectively reasonable for plaintiff to view environment as offensive, hostile or abusive after several months of defendant grabbing her

hand, touching her hair and making "ten to twenty insinuating comments" that plaintiff was involved or interested in married men).

The instant case bears many similarities to *Magill v. Precision Sys. Mfg., Inc.*, 2006 WL 468212 (N.D.N.Y. Feb. 27, 2006). There, plaintiff complained that, upon becoming her manager, and for a period of six months, defendant "attempted to insinuate himself into her personal life and to use his supervisory status over her as a way of controlling her." *Id.* at *2. Plaintiff was told that "she needed to change her standards and her friends," she needed "a different way of thinking." Additionally, defendant bought her gifts for herself and her children, and became angry when he learned plaintiff had a boyfriend. After learning that plaintiff was wearing a watch given to her by her boyfriend (instead of the watch he had given her) defendant told Plaintiff that she "was never going to make it" in the company and would no longer be groomed for the position he initially intended to prepare her. *Id.* at *2. The court found sufficient evidence upon which a reasonable factfinder could conclude she suffered sexual harassment and/or a hostile work environment.

Additionally, the existence of questions of fact surrounding Plaintiff's encouragement of Miller's attention and alleged discomfort in rejecting Miller, coupled with Plaintiff's testimony as to Miller's power in the department and her fear of retaliation, satisfy this Court that Plaintiff has shown that she felt her work environment was hostile. Particularly noteworthy here is Miller's awareness of Plaintiff's history of anorexia and depression, and her need for extra money to pay medical bills in connection with these conditions. A jury could conclude that Miller used this information to his advantage in encouraging Plaintiff to develop and maintain a relationship with him. (*See*, *e.g.*, Schlossberg Aff. Ex. L at 2 ("I can offer you unconditional

support and security.  I do not know if or when you will find a mate (I would love to go to your wedding but that is a hope not a certainty.)"); *id.* at 3 ("If you find anything in this note that suggests a negative side to you, your mind is playing tricks."); *id.* Ex M (offering Plaintiff "help with all medical/dental problems" and claiming "a look into the future suggests (unless you take steps to better your basic issues) a lot of trouble"); *id.* at 2 ("while I may create tension, part of the problem is intrinsic to your illness, *i.e.*, your problem with relationships."); *id.* Ex. Q at 1-2 ("What upsets me?  You never express affection?  You either don't have it (which I doubt) or you don't know how to do it....I do not expect the depth of feeling from you that I have for you– if such existed and you didn't express it, it would be tragic....I urge you to...discuss it with your therapist....if you cannot commit emotionally to me...it is going to be hard for you in relationships where the bonds are different....I need to know if you want my warmth or not."); Ex. X ("If you don't take advantage of what I might provide you hurt both of us....I know you are anemic, have a [*sic*] low potassium, have too low a blood pressure, likely significant osteoporosis, calcium low."); Ex. X at 5 ("I realize that dealing with you when you are not doing well is a challenge but please, take a step back and even though you may not be able to care in return you don't have to be so hurtful."); Arbitration Award at 31 ("[M]iller made clear that he considered [Plaintiff] ungrateful and irrational for wasting a fine opportunity to better herself and improve her health.  His expressions...did not rise to the level of threats but they can be considered a form of retaliation.").)  Even after SUNY instructed Miller to avoid Plaintiff, he allegedly left flowers and a note in her office saying, *inter alia*, "[s]ooner or later we will meet – I won't bite– no need to hide." (Pack. Decl. Ex. E at 10 ¶ 51.)  He also allegedly called

Plaintiff's office and threatened her by asking, "Do you think the IRS would be interested in your situation?" (Pack Decl. Ex. E at 10 ¶ 53.)

Moreover, Plaintiff's testimony that she would be forced to have many long conversations with Miller upon rejecting his offers (a contention supported by the Arbitration Award), and "flipped out" when Miller continued attempting to contact her after her return, are sufficient to raise a question of fact as to whether the alleged harassment was subjectively offensive. *See Holtz*, 258 F.3d at 76 (Plaintiff's "sworn assertions [that she burst into tears when describing the harassment and two years later, was still physically and emotionally distressed talking about it], if credited by a trier of fact would suffice" to meet this requirement); *cf. Carerro v. New York City Housing Auth.*, 890 F.3d 569, 578 (Plaintiff's supervisor "held a position of power over her that, in combination with his unwelcome sexual advances, was tantamount to coercion").

"Resolving ambiguities and drawing inferences in [Plaintiff's] favor...we cannot say as a matter of law that these incidents could not amount to a claim of hostile work environment," making summary judgment inappropriate. *Schwapp v. Town of Avon*, 118 F.3d 106, 112 (2d Cir. 1997) (ten racially hostile comments and two incidents in 20 month period sufficient to withstand summary judgment); *see also Holtz*, 258 F.3d at 75 ("The question of whether a work environment is sufficiently hostile to violate Title VII is one of fact. Summary judgment is appropriate only if it can be concluded as a matter of law that no rational juror could view the defendant's conduct as an intolerable alteration of the plaintiff's working conditions.").

1.      *Vicarious Liability*

Whether SUNY can, in any event, be held liable for the acts of Miller, turns on the application of vicarious liability.  "The starting point for analyzing employer vicarious liability in a Title VII hostile work environment action is to determine whether the person who allegedly created that environment is properly characterized as having been the plaintiff's supervisor." *Mack v. Otis Elevator Co.*, 326 F.3d 116, 123 (2d Cir. 2003).  Under *Faragher v. City of Boca Raton*, 524 U.S. 775 (1998), and *Burlington Indus., Inc. v. Ellerth*, 524 U.S. 742 (1998), "which together provide the bedrock upon which the current law of vicarious liability in Title VII hostile work environment cases is built, it is only when a supervisor with immediate (or successively higher) authority over the employee has engaged in the complained of conduct, that the employer may be subject to vicarious liability."  *Mack*, 326 F.3d at 123 (citations omitted).


*Supervisory Power*

"[T]he Second Circuit gives a broad meaning to what constitutes the authority worthy of a supervisor."  *Heskin v. Insite Advertising, Inc.*, 2005 WL 407646, at *18 (S.D.N.Y. Feb. 22, 2005) (*quoting Mack*, 326 F.3d at 126).  When "the authority given by the employer to the [offending] employee enabled or materially augmented the ability of the latter to create a hostile work environment for his or her subordinates," the employee will be considered a supervisor. *See Mack*, 126 F.3d at 126; *see also id.* (finding persuasive EEOC enforcement guidelines which state, *inter alia*, that "if the individual has authority to undertake or recommend tangible employment decisions affecting the employee," the individual qualifies as a supervisor.).

It is apparent from the record that Miller did supervise Plaintiff, as he facilitated her participation in overtime work performed at his home and paid for by Defendant SUNY. (Schlossberg Aff. Ex. C at 106, *id.* at Ex. G (Form authorizing additional funds for overtime project); Kritzer Aff. Ex. 1A at 699 (McCoy Arbitration Testimony) (Plaintiff "an individual for whom [Miller] had responsibility as an immediate supervisor for the $15,000 project").) He also brought that project to an end. Additionally, Miller's suggestion to Plaintiff that he had invested significantly in her career and was therefore due a return precludes his argument that he was not supervising her. (Schlossberg Aff. Ex. O at 2 ("What do I get for providing you with a computer, training, etc? In the strictly business sense, it seems like a whole lot for nothing. Especially since I am paying you time-and-a-half for what you could do for time in the office? Please explain to me why this situation should continue.").)

Furthermore, in the emails Miller wrote to Plaintiff on August 20 and 21, 2001 – *after* her complaint to SUNY – he reports to her that Kelly is no longer her supervisor and that the Chairman of the Department, Dr. Lane, has assigned her to report to Miller. (*See* Kritzer Aff. Ex. 5.) Miller began the first of these e-mails with the statement "It is crucial that we resolve this matter today." He pointed out that Plaintiff missed "several appointments" with him, and told her that "the only real condition is that we communicate." (*Id.*; *see also* Schlossberg Aff. Ex. AA (letter from Miller to Plaintiff's parents indicating she "has recently begun a special project under my direction").) As he hired and fired her for an outside project, helped her to receive salary adjustments, and used his position of power to effectuate inappropriate meetings with her after her complaint of harassment, Miller qualifies as Plaintiff's supervisor for Title VII purposes.

*Adverse Employment Action*

The next inquiry in determining whether SUNY can be held vicariously liable is whether Plaintiff suffered an adverse employment action. "Where the harassment is attributed to a supervisor with immediate or successively higher authority over the employee, a court first looks to whether the supervisor's behavior 'culminated in a tangible employment action' against the employee...[I]f it did, 'the employer will, *ipso facto*, be vicariously liable.'" *Petrosino*, 385 F.3d at 225 (*quoting Ellerth*, 524 U.S. at 765.). Plaintiff alleges she suffered an adverse employment action when Miller discontinued her work on the special project. However, she testified in her deposition that Defendant SUNY compensated her for the lost overtime through a different overtime project, rendering meritless her claim that she suffered an adverse employment action. (Schlossberg Aff. Ex. C at 548-550.)

*Vicarious Liability in the Absence of an Adverse Employment Action*

"Where a tangible employment action is not involved the employer is nonetheless subject to vicarious liability to a victimized employee for an actionable hostile environment created by a supervisor with immediate...authority over the employee." *Mack*, 326 F.3d at 125 (*quoting Faragher* and *Ellerth*). However, the absence of an adverse employment action permits SUNY to raise the affirmative defense promulgated in *Faragher* and *Ellerth*, provided it can show the following:

> (a) that the employer exercised reasonable care to prevent and correct promptly any sexually harassing behavior, and (b) that the plaintiff employee unreasonably failed to take advantage of any preventing or corrective opportunities provided by the employer or to avoid harm otherwise.

*Ellerth*, 524 U.S. at 765; *Faragher*, 524 U.S. at 807.

*First Element of Faragher/Ellerth Affirmative Defense*

It is undisputed that, once Plaintiff told Kelly that she felt sexually harassed by Miller, SUNY took prompt action to protect her from further harassment by allowing her to stay home from work until Miller's office was moved, investigating the substance of her complaint, and ultimately instituting proceedings to have Miller terminated. In response, Plaintiff argues that SUNY was on constructive notice of her claim prior to her August 6, 2001 complaint to Kelly:

> Andrea Schmidt did tell Barbara Kelly back in June or July how she was feeling uncomfortable and overburdened about what was generally going on, and such generalities were enough information when Barbara Kelly later passed them on to Barbara Johnson such that Barbara Johnson suspected Dr. Miller was harassing Andrea Schmidt and suggested the further step of filing a complaint to Andrea and then accompanied her to the Office of Affirmative Action.

(Pl. 56.1 Stat. ¶ 13.) This argument fails for two reasons. Firstly, "generalities" are not enough to put an employer on notice. *Murray v. New York Univ. College of Dentistry*, 57 F.3d 243 (2d Cir. 1995) (complaints of harasser's staring, requesting dates, and making general comments on plaintiff's appearance insufficient to put university on notice of harassment, and fact that "numerous" other students knew of misconduct does not constitute university's constructive notice); *O'Dell v. Trans World Enter.*, 153 F. Supp. 2d 378 (S.D.N.Y. 2001) (comment that it was "not a good idea" to promote alleged harasser and that promotion would be a "grave mistake," coupled with employers knowledge that plaintiff and alleged harasser went on one or two dates insufficient to establish constructive notice). Prior to August 6, 2001, Plaintiff provided only general comments that she was "uncomfortable" and felt Miller was "overbearing," which fall short of establishing constructive notice of harassment. Plaintiff's testimony that she "thought" Kelly warned Dr. Miller that his behavior bordered sexual harassment does not strengthen her position. (Pl. 56.1 Stat. ¶ 13.)

Second, the "further step" suggested by Barbara Johnson occurred *after* Plaintiff's

August 6, 2001 complaint to Kelly. It was only after this date that Plaintiff contacted the Office

of Affirmative Action. Therefore, Plaintiff has failed to show constructive notice and, by

permitting Plaintiff to remain at home during the pendency of its investigation of her sexual

harassment claims, moving Miller's office, offering Plaintiff another parking space, providing

her with a replacement project to compensate for the overtime work lost, and instituting an

action to remove Miller from its employ – which would have happened but for the Arbitrator's

decision ordering a suspension and counseling – SUNY adequately responded to Plaintiff's

complaint.[4]

Therefore, the Court must consider August 6, 2001 as the date on which she first took

advantage of SUNY's complaint procedures.


*Second Element of Faragher/Ellerth Affirmative Defense*

"The requirement to show that the employee has failed in a coordinate duty to avoid or

mitigate harm reflects an equally obvious policy imported from the general theory of damages,

that a victim has a duty to use such means as are reasonable under the circumstances to avoid or

---

[4] Plaintiff's argument that SUNY was on notice because "constructive knowledge...will be imputed to an employer when an official is at a sufficiently high level in the company's management hierarchy to qualify as a proxy for the company" is also unavailing. The cases cited by Plaintiff are inapposite, as they involve co-worker harassment. *See* C.F.R. § 1604.11(d) ("*With respect to conduct between fellow employees*, an employer is responsible for the acts of sexual harassment...where the employer (or its agents or supervisory employees) knows or should have known of the conduct, unless it can show that it took immediate and appropriate corrective action) (emphasis added). Plaintiff cannot simultaneously argue that Miller was and was not a supervisor. The Court found that Miller did function as Plaintiff's supervisor, and, in the absence of an adverse employment action, SUNY is automatically liable for his actions, subject only to fulfillment of the elements of the *Faragher/Ellerth* affirmative defense.

minimize the damages that result from violations of [Title VII]." *Faragher*, 524 U.S. at 775. "If the victim could have avoided the harm, no liability should be found against the employer who had taken reasonable care, and if damages could reasonably have been mitigated no award against a liable employer should reward plaintiff for what her own efforts could have avoided." *Id.*

"Evidence of any unreasonable failure of [by the employee] to use any complaint procedure provided by the employer...will normally suffice to satisfy the employer's burden under the second element of the defense." *Ellerth*, 524 U.S. at 765. "The policy rationale underlying such a rule is...[that] [e]mployees must be required to accept responsibility for alerting their employers to the possibility of harassment." *O'Dell*, 153 F. Supp. 2d at 390.

In *Leopold v. Baccarat, Inc.*, 239 F.3d 243, 246 (2d Cir. 2001), the court articulated a burden-shifting test whereby the employer must first demonstrate that the employee unreasonably failed to take advantage of an employer's corrective procedures. Upon that showing, the burden shifts to the employee to state the reasons why he or she failed to do so. For the reluctance to report harassment to preclude the employer's use of the affirmative defense, "it must be based on apprehension of what the employer might do...[and be] based more on the employee's subjective belief." *Leopold*, 239 F.3d at 246.


*Plaintiff's Complaint To SUNY*

Because hostile work environment claims are based on the "cumulative effect of individual acts," *Morgan*, 536 U.S. at 115, this Court was earlier required to consider specific incidents of harassment alleged by Plaintiff for which she has provided no date, and some of

those may very well fall outside of the 300-day limitations period. *See supra* n.2. However, it is certain that August 6, 2001 is over one year after the July 2000 incident during which Miller is alleged to have placed a sign on Plaintiff's desk indicating her accommodating nature and her availability to suitors. (Am. Complaint ¶ 14.) Because she waited more than a year from this event to complain specifically about Miller's alleged sexual harassment, Plaintiff failed to reasonably avail herself of the remedial measures available by SUNY. *See, e.g., O'Dell*, 153 F. Supp. 2d at 391 (plaintiff's 11-month delay in complaining of supervisor's harassment unreasonable); *Dayes v. Pace Univ.*, 2000 WL 307382, at *6 (S.D.N.Y. Mar. 24, 2000) (plaintiff's delay of one year from the inception of supervisor's harassment unreasonable as a matter of law). Therefore, Defendant SUNY has succeeded at demonstrating that Plaintiff unreasonably delayed in taking advantage of its complaint procedures.

*Plaintiff's Reason for Delay*

Plaintiff has failed to advance a sufficient reason for her failure to notify anyone at SUNY prior to August 6, 2001 that she believed Miller's conduct constituted sexual harassment. "For [the] reluctance to report harassment to preclude the employer's affirmative defense, it must be based on apprehension of what the employer might do." *Leopold*, 239 F.3d at 246. "Evidence must be produced to the effect that the employer has ignored or resisted similar complaints or has taken adverse actions against employees in response to such complaints." *Id.* (affirming summary judgment in favor of defendant where plaintiff "simply asserted her apprehension that she would be fired...and claimed generally that a co-worker's vague and ambiguous complaint was not taken seriously"). As Plaintiff has not presented any evidence

28

excusing her failure to complaint sooner, SUNY has demonstrated its entitlement to the affirmative defense articulated in *Faragher/Ellerth*, and cannot be held vicariously liable for the acts of Miller.


III.     *Conclusion*

Plaintiff's Title VII claim against SUNY are hereby dismissed.  Though the record strongly indicates that Defendant Miller engaged in prohibited conduct, that alone is insufficient to hold SUNY responsible for his actions.  Plaintiff's complaints that Miller was overbearing and disruptive are, quite simply, insufficient to put her employer on notice that illegal conduct may have been occurring on its premises.  The record is clear that, once Plaintiff notified Kelly of the exact nature of Miller's requests and advances, SUNY took swift action to separate the two, and did everything in its power to terminate Miller.  But for the arbitrator's decision to suspend him without pay in lieu of termination – a decision over which SUNY had no control – Miller would no longer be employed by SUNY.

If true, Miller's actions in aggressively soliciting and demanding the attention of a young and vulnerable woman to whom he acted as a superior, are deplorable, punishable and, to say the least, unbecoming of a person of his apparent stature and professionalism.  However, Plaintiff has not shown that those actions ought to be imputed to SUNY and, as a matter of law, they cannot be.  Consequently, Plaintiff's Title VII claim is dismissed.  Plaintiff asserts no other basis for subject matter jurisdiction.  This Court declines to exercise supplemental jurisdiction over her state law claim against Miller.[5]  The Clerk of the Court is directed to close the case.

**SO ORDERED.**

_____
S/
SANDRA L. TOWNES
United States District Judge

Dated: Brooklyn, New York
       May 5, 2006

---

[5] Title 28 U.S.C. § 1367(c)(3) "permits a district court in its discretion, to decline to exercise supplemental jurisdiction over state law claims if it has dismissed all federal claims." *Tops Markets, Inc. v. Quality Markets, Inc.*, 142 F.3d 90, 103 (2d Cir. 1988).